UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

LYNNE F. STEWART,

                    Petitioner,

      -against-

UNITED STATES OF AMERICA,

                    Respondent.

-----------------------------------------------------------------X

## MOTION TO REDUCE, MODIFY OR VACATE SENTENCE PURSUANT TO 28 U.S.C. §2255 AND 18 U.S.C. §3582

PLEASE TAKE NOTICE, that upon the annexed declaration of Jill R. Shellow, Esq., dated July 29, 2013, the exhibits attached thereto, the accompanying memorandum of law, and all files, records and prior proceedings heretofore had herein, the undersigned will move this Court before the Honorable John G. Koeltl at a date and time set by the Court for an order vacating the sentence of this Court dated July 16, 2010 under Indictment 02-CR-395 (JGK).

Ms. Stewart is dying. Her condition is rapidly deteriorating.

Accordingly, expedited consideration is respectfully requested.

Dated:        New York, New York
              July 29, 2013

                         Respectfully submitted,

                         JILL R. SHELLOW
                         LAW OFFICES OF JILL R. SHELLOW
                         111 Broadway, Suite 1305
                         New York, New York 10006
                         212.792.4911
                         jrs@shellowlaw.com


                         ROBERT J. BOYLE

                         351 Broadway, 3d Floor
                         New York, N.Y. 10013
                         212.431.0229
                         Rjboyle55@gmail.com

                              *Attorneys for Lynne Stewart*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

LYNNE F. STEWART,

                    Petitioner,

     -against-

UNITED STATES OF AMERICA,

                    Respondent.

-------------------------------------------------------------X

## DECLARATION OF JILL R. SHELLOW

     I, JILL R. SHELLOW, hereby declare under penalty of perjury the following based on my personal knowledge, information and belief:

     1.    I am the attorney of record for Lynne Stewart, and I make this Declaration in support of Ms. Stewart's motion for an order (a) vacating or modifying her sentence to time-served pursuant to 28 U.S.C. § 2255 and 18 U.S.C. § 3582; (b) immediately releasing her from custody pending a final ruling on the merits, and (c) directing the Bureau of Prisons to produce documents.

     2.    The petition further requests that determination of this request be made on an expedited basis as Ms. Stewart is dying and her ability to function is rapidly deteriorating every day.

     3.    By way of background, I have represented Ms. Stewart continuously since August 2003 in connection with these proceedings except during the period of time after judgment was entered in October 2006 until approximately January

2010 following the Order of the United States Court of Appeals for the Second Circuit remanding the matter to the District Court for re-sentencing.   Working with me on this motion is Robert J. Boyle, Esquire, who was appointed by the Court of Appeals to assist with the appeal of her re-sentencing and subsequent appeals.

**Procedural History**

4.     This Court is intimately familiar with the record of these proceedings.  Accordingly, only those aspects of the procedural history that are necessary to establish the basis for the relief requested will be set forth.

5.     In April 2002, Ms. Stewart, a well-respected criminal defense lawyer, was indicted for conspiracy to provide material support to a terrorist organization and making false statements to the United States government in connection her legal representation of Sheik Omar Abdel Rahman.  Ms. Stewart's trial started in May 2004.  After a jury trial that lasted 10 months, Ms. Stewart and two co-defendants were convicted on February 10, 2005.

6.     On October 16, 2006, this Court sentenced Ms. Stewart to 28 months incarceration.  *See* Judgment (Exhibit A) and Transcript of Sentencing Proceedings  (Exhibit B).

7.     On November 17, 2009, the Second Circuit Court of Appeals upheld Ms. Stewart's conviction and remanded the case to this Court directing that this Court consider whether the sentence imposed was too lenient.  The Second Circuit

further ordered that Ms. Stewart start serving her sentence immediately. *See United States v. Stewart*, 2009 WL 3818860 (2d Cir. Nov. 17, 2009) at *52.[1]

8.     On November 19, 2009, Ms. Stewart surrendered to the U.S. Marshal and was committed to the Metropolitan Correctional Center to begin serving her term of imprisonment.  In or about October 2010, Ms. Stewart was transferred to Federal Medical Center ("FMC") Carswell in Fort Worth, Texas, where she remains incarcerated.[2]

9.     On July 16, 2010, this Court re-sentenced Ms. Stewart to 120 months imprisonment.  Ms. Stewart appealed the sentence, and it was affirmed by the Court of Appeals on June 28, 2012. *See United States v. Stewart*, 686 F.3d 156 (2d Cir. 2012).  Ms. Stewart filed a Petition for Rehearing that was denied, *United States v. Stewart*, Docket No. 10-3185 (Entry #123), and on February 25, 2013, Ms. Stewart filed a timely Petition for a Writ of Certiorari.  The Solicitor General filed an Opposition to the Petition on May 28, 2013. *See Stewart v. United States*, Docket No. 12-8891 (U.S.).  The undersigned is drafting a short Reply that will be filed this summer.  The Petition will be presented to the justices for conference on September 30, 2013.  (Exhibit  D)

---

[1]  On December 23, 2009, the Court of Appeals amended this opinion.  The final published opinion appears at *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009).

[2]  As of July 26, 2013, Ms. Stewart will have served 1,344 days (42 months) in prison, and the BOP currently projects she will be released in five years and one month – on August 27, 2013.  (Exhibit  C)

**The Initial Cancer Diagnosis and Treatment**

10.     In or about November 2005, Ms. Stewart was diagnosed with cancer in her left breast – invasive ductal carcinoma.  There was also in situ carcinoma.  She was treated by Michael L. Grossbard, M.D., at St. Luke's Roosevelt Hospital Center in New York City.  In January 2006, she underwent a lumpectomy with node dissection and over the next 6.5 weeks completed a course of adjuvant radiation therapy.  Thereafter, she started and completed a five-year course of oral chemotherapy with Arimidex.  *See* Letters of Michael L. Grossbard, Feb. 28, 2006 and Jun. 28, 2006  collected in Exhibit E.  She completed the recommended five-year course of chemotherapy in prison.

**The Recurrence Of The Cancer**

11.     On July 11, 2012, in preparation for a hysterectomy, a routine chest X-ray revealed a nodule on Ms. Stewart's lung.  At CT scan on August 6, 2012 revealed a mass in her left breast with two separate axillary lymph nodes and several masses in her lungs.  A PET/CT scan on September 28, 2012 confirmed cancers in her lungs, lymph nodes and scapula that were consistent with a breast primary tumor.[3]  *See also* letter of Michael L. Grossbard, M.D., Jul. 26, 2013 (Exhibit H).

---

[3]   The Center for Cancer and Blood Disorders, in Fort Worth, TX ("the Center") provides Ms. Stewart's oncology care and treatment.  When I telephoned the Center to request medical records, an administrative aide told me that all of Ms. Stewart's medical records, including reports, notes, and test results are provided to the prison and that I would have to make my records request to the institution.  The BOP's first response to the request made by Ms. Stewart for a copy of her medical records so that she could provide them to me in April 2013 was incomplete.  A more complete response was made on July 9, 2013, but records are obviously still missing.  At my request, a summary was prepared of the records received.  The summary is provided for the Court's convenience at Exhibit F.  A selection of the more significant records received, including radiology reports, reports from the Center, the pathology and selected lab

12.     On November 29, 2012, after an inexplicable delay of approximately

four months, Ms. Stewart had a lymph node biopsy, conclusively establishing

metastatic breast cancer (stage IV).  See Exhibits F (summary of medical records),

Exhibit G (selected medical records) and Exhibit H (Grossbard letter).

13.     Ms. Stewart received three doses of hormonal treatment in

December 2012 and January 2013, but was not started on chemotherapy until

February 2013, approximately three months after receiving a definitive diagnosis.

As of this writing she has completed six cycles of chemotherapy but her disease

continues to progress.

14.     The treating oncologist from the Center has told Ms. Stewart that

there is no cure for stage IV breast cancer; Ms. Stewart's cancer is incurable.  The

only current hope is that Ms. Stewart will be able to tolerate a second line

chemotherapy and that it will slow the spread of the cancer and minimize the

complications common in cancer patients with metastases including anemia, bone

marrow suppression, blood clots, infections in the Port used to administer

medications, lymphedema (swelling in the arms and legs) and side-effects that

chemotherapy has on the immune system and renal and liver function.

**Request for Compassionate Release**

---

reports, and some of the "administrative notes" of Ms. Stewart's daily contacts with the team that oversees
her hospital care in the medical-surgical unit where she is housed appear in Exhibit G.  At my request, Drs.
Michael L. Grossbard and Richard Dundy, M.D. reviewed the summary and agree that it is accurate.  See
Exhibits H (Grossbard letter, Jul. 26, 2013) and Exhibit J (Dundy letter, Jul. 26, 2013).  The *curriculum
vitae* of Drs. Grossbard and Dundy appear in Exhibits I and K, respectively.  A copy of all the records
received from the BOP can be made available to your Honor in PDF form (or on paper) upon request.

15.    On April 12, 2013, Ms. Stewart filed a formal request with the Warden at FMC Carswell for compassionate release. (Exhibit L) Her application cited her illness and weakened condition and a set forth a release plan for her care which included that she would live with her husband, Ralph Poynter, in the home of her son, Geoffrey Stewart, in Brooklyn.

16.    On May 3, 2013, a probation officer from the U.S. Probation Department in the Eastern District of New York completed a visit to Geoffrey Stewart's home and approved it as a suitable residence post release. Thereafter, I was advised that on May 10, 2013, the Warden of FMC Carswell forwarded Ms. Stewart's application to the BOP Central Office with a recommendation that it be approved. This was confirmed to me by former Attorney General Ramsey Clark who spoke personally with Kathleen M. Kenney, Assistant Director/General Counsel, BOP.

17.    On May 14, 2013, I wrote to Charles E. Samuels, Jr., the Director of the Bureau of Prisons. I explained that I had spoken with Ms. Stewart by telephone and that "given her poor prognosis and her weakened physical condition" I was respectfully urging him to act favorably on the application without further delay. I offered to provide any additional information that might be required, and I sent a copy, also via Federal Express, to Ms. Kenney. I never received a response.

18.    On May 28, 2013, I attempted to follow-up on Ms. Stewart's application and my correspondence by telephoning Ms. Kenney. I spoke with

James Wills in her office.  Mr. Wills told me that he had Ms. Stewart's application in his office, that it had been in his office "for a while" and that while he understood that it was a medically-based request and therefore "time-sensitive" he was "working on it as fast as [he could.]"  He said that the application had been "logged-in," but that he still had to review it, look at it and at the information from the invitation, and then write a letter that would go over Ms. Kenney's signature to the Director of the BOP with a recommendation.  He also said that he had to gather information from the crime victims and ask the opinion of the United States Attorney whose office had prosecuted the case.  He would not give me an estimate of when any action would be taken.

19.     On Monday, June 17, 2013, I was advised informally that the application, with all the necessary reviews and recommendations, was in the office of the Director and that the only action remaining to be taken was his determination of whether or not to approve Ms. Stewart's application.

20.     On June 24, Ms. Kenney, advised the Warden at FMC Carswell in writing that "[w]hile [Ms. Stewart's] illness is very serious, she is not suffering from a condition that is terminal within 18 months.  Accordingly, Ms. Stewart does not present circumstances considered to be extraordinary and compelling to merit RIS [a reduction in sentence] at this time." (Exhibit M)[4]

---

[4]  The only copy of this Memorandum that I have was obviously highlighted before it was copied and provided to me.  Thus, it is difficult to decipher.  For your Honor's convenience, it is transcribed here and in the exhibit:

21.     Both Ms. Stewart and Robert Boyle, Esq., on behalf of Ms. Stewart asked the BOP for copies of the records on which the Director relied in making his decision to deny the application.  Both were advised that the only avenue for securing those documents was to make a request pursuant to the Freedom of Information Act.

---

                              Jun 24, 2013

MEMORANDUM FOR   JODY R. UPTON, WARDEN
                FEDERAL MEDICAL CENTER, CARSWELL

FROM:           Kathleen M. Kenney
                Assistant Director/General Counsel

SUBJECT:        STEWART, Lynne Irene
                Federal Register No. 53504-043
                Request for Reduction in Sentence

Please be advised that Ms. Stewart's request for a reduction in
sentence (RIS) pursuant to 18 U.S.C. §3582 (c)(1)(A)(i) is
denied. We have carefully reviewed the documentation submitted
with this request and have consulted with the Medical Director,
Health Services Division.

Ms. Stewart, age 73, has been diagnosed with metastatic breast
cancer for which she is currently receiving treatment. To date,
she has been responding well to treatment. Ms. Stewart is
ambulatory and independent in her Activities of Daily Living.
While her illness is very serious, she is not suffering from a
condition that is terminal within 18 months. Accordingly, Ms.
Stewart does not present circumstances considered to be
extraordinary and compelling to merit RIS at this time.

Ms. Stewart will continue to receive appropriate medical care.
Staff will continue to carefully monitor her condition to
determine if RIS may be appropriate in the future. Of course, Ms.
Stewart can also request reconsideration of her RIS request
should her condition change. Please provide Ms. Stewart with a
copy of this decision.

cc:  J.A. Keller, Regional Director, SCRO

                              - 8 -

22.     As the following conclusively demonstrate, the Director's determination that Ms. Stewart may survive 18 months or more from today is now refuted by the BOP's own medical staff as well as experts in the field.

23.     All the doctors agree that Ms. Stewart is dying and that it is just a matter of time:

> A.     On May 10, 2013, Prasanthi Ganesa, MD, Ms. Stewart's treating physician at Carswell, opined that for patients such as Ms. Stewart, "[t]he overall prognosis is 2 years." *See* medical records from the Center reproduced in Exhibit G.

> B.     Dr. Grossbard, Ms. Stewart's treating physician starting when she was initially diagnosed in 2005 and until her incarceration in 2009, would say that Dr. Ganesa's conclusion is a fair assessment except for one crucial omission:   One must start counting from the date the metastases are first identified. (Exhibit H).   In his opinion, the metastatic disease was first apparent on July 11, 2012. *Id.*  Thus, it is his opinion that Dr. Genesa's "two year" prognosis is from that date.  He concludes that

>> [T]he fact that Ms. Stewart's disease has progressed on therapy along with the decline in her overall performance status and medical condition suggests that her survival is likely to be much shorter.  The pace of her disease and the progression of her metastases suggest that her survival will be less than 12 months at this time.

> *Id.*

C.     Richard Dundy, MD, a palliative care specialist and acting medical director for Visiting Nurse Service of New York Hospice observes from his review of the medical records that Ms. Stewart's "disease has progressed in spite of therapy, and … it is evident she is declining clinically and functionally." (Exhibit J)  He concludes that if her case were presented to him for "consideration as [a] potential hospice patient – that is, were [he] asked to render a professional medical opinion that she is likely to die within six months – all of [his] experience and the relevant data would support the conclusion that she would meet eligibility criteria for hospice." *Id.*

D.     Finally, Ms. Stewart was advised that on Friday, July 19, 2013, Dr. Ganesa had revised her prognosis downward.  Ms. Stewart's treating physician at the prison, Nahia Lorenzi, MD, informed Ms. Stewart that Dr. Ganesa now estimates Ms. Stewart's life expectancy at approximately 18 months and that Dr. Ganesa would support Ms. Stewart in a request for reconsideration of the denial of the compassionate release application.

24.     Ms. Stewart reports that prior to April 2013 she was "independent" in the sense that she could perform what medical and social work professionals call her "activities of daily living" – with help from her roommates and friends.[5]

---

[5]   Activities of daily living (ADLs) is a term used in healthcare to refer to daily self-care activities within an individual's place of residence, in outdoor environments, or both.  Health professionals refer to the ability (or inability) to perform ADLs as a measurement of the

(Exhibit N)  Now, however, she needs help bathing and with personal care and she needs a walker and a wheelchair to get around.  Moreover, in April 2013, her white blood cell count dropped dangerously low as a side effect of chemotherapy.  She was hospitalized in isolation which is where she remained until several days ago.  On days when her white blood cell counts are high enough, she is permitted to access to the hospital floor, to make telephone calls, and for no more than one hour per day to have access to the education department where she can use a recreational library and a computer to read and send emails.  *Id.*  On days when her white blood cell counts are low, she is restricted to her room and must wear a mask whenever anyone enters.  She tries to keep her spirits up, but she reports that she is easily confused ("chemo-brain" she calls it), and that she is tired all the time.   In short, contrary to the Kenney memorandum setting forth the reasons why the BOP had denied her compassionate release application, she is neither independent in her ADLs, nor is she ambulatory.

25.    Just as Ms. Stewart's condition changes from day-to-day, the information about the progression of her disease is similarly dynamic.  Two weeks ago she was supposed to have another staging PET scan so that the doctors could determine which second- and third-line chemotherapy agents to try next.  But the scan never happened because the paperwork necessary was not completely

---

functional status of a person. ADLs are defined as "the things we normally do...such as feeding ourselves, bathing, dressing, grooming, work, homemaking, and leisure." *See* http://en.wikipedia.org/wiki/Activities_of_daily_living.  One mnemonic that some consider useful is DEATH: dressing, eating, ambulating (walking), toileting, hygiene (including grooming and hair washing).

prepared and communicated between the prison hospital and the Center. Ms. Stewart was told that the scan would likely be delayed until August. Last week, however, she was told that the scan might happen as soon as this week.

26.     Ms. Stewart intends to ask the BOP to reconsider her application for compassionate release as soon as she receives the results of this PET scan. She will rely on Dr. Ganesa's revised prognosis and the opinions expressed by Drs. Grossbard and Dundy.

27.     I last visited Ms. Stewart on November 29, 2012 after the diagnosis was a sure thing and before she started chemotherapy. I speak to her on the telephone about once every 10 days. I can tell, based on the years that I have known Ms. Stewart, that the chemotherapy she receives to slow the spread of the disease is not only poisoning her body, but it is diminishing her mind. While there is still a lot of determination in her voice, she cannot hold onto facts, and logical reasoning eludes her. Her frustrations are palpable; the isolation unbearable. I have not been able to go back to Carswell these last several months. On October 2, 2012, my best friend of more than 35 years, re-discovered as my true love four years ago, was diagnosed with a stage IV cancer. He died barely six months later on April 6, 2013. I am not strong enough to face this disease in person again so soon. He died imprisoned in a brain that was riddled with metastatic tumors – unable to communicate with those who were there to provide him with support and love. Lynne Stewart is imprisoned by a system that refuses

to exercise its power to be compassionate and, thus just like him, is unable to experience the support and the love of her family.

28.     As more fully argued in the accompanying memorandum of law, both 28 U.S.C. § 2255 and 18 U.S.C. § 3582 provide this Court with jurisdiction and the authority to reduce Ms. Stewart's sentence to time served so that she can spend her last days in the company of those who love her so very much.

29.     This application is being brought on an Order To Show Cause and not pursuant to Notice of Motion because Ms. Stewart is suffering from a terminal illness and her health is deteriorating rapidly which constitute "good and sufficient reasons."  *See* Local Rule 6.1(d).  No prior application for the relief requested herein has been made before this or any other court.  On Monday, July 29, 2013, I spoke to AUSA Andrew S. Dember.  I told him about this filing and that we were proceeding by Order to Show Cause.

30.     On July 29, 2013, I hand delivered a copy of the Petition, the memorandum of law in support, this declaration (with exhibits), and a proposed Order to Show Cause, to Assistant United States Attorney Andrew S. Dember.  On the same day, I also sent him a copy by email.

Dated:        New York, New York
              July 29, 2013

                        Jill R. Shellow
                        Law Offices of Jill R. Shellow
                        111 Broadway, Suite 1305
                        New York, NY  10006
                        Tel:   212.792.4911
                        Fax:   212.792.4946
                        Email:   jrs@shellowlaw.com